**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Telephone: (626) 550-1250
Facsimile: (619) 756-6991

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
ltfisher@bursor.com
Brittany S. Scott (SBN 327132)
bscott@bursor.com
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

*Interim Co-Lead Counsel*

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE DATA PRIVACY LITIGATION | No. 5:22-cv-07069-EJD (Consolidated) |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | <u>**JURY TRIAL DEMANDED**</u> |
| | Judge Edward J. Davila |

Plaintiffs Bruce Puleo, Carlina Green, David Sgro, A.H. (a minor), Dottie Nikolich, Elena Nacarino, Francis Barrott, Katie Alvarez, E.M. (a minor), and Quincy Venter ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Apple, Inc. ("Defendant" or "Apple"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE CASE

1. Plaintiffs bring this case to stem the tide of corporate surveillance and restore consumer autonomy over their personal information. This is a proposed class action brought against Apple for the improper collection and use of Apple mobile device users' data when they interact with Apple's proprietary applications ("Apps")—including the App Store, Apple Music, Apple TV, Game Center, Books, and Stocks—on their mobile Apple devices (i.e., iPhone, iPad, or Apple Watch). Apple purported to give consumers autonomy over data collected by such Apps by allowing them to choose settings that restricted Apple's collection, storing and use of such data. But Apple disregarded these choices and collected, stored and used such data anyway.

2. Consumers value their data privacy and increasingly find that safeguarding their privacy is critical in a virtual and interconnected society. People have become more aware and concerned that large corporations are collecting, recording, and exploiting their personal communications and private information for profit. In response to the consumer demand for privacy, Apple made privacy its brand – even going so far as saying, "Privacy. That's Apple." *Apple Privacy Policy,* APPLE, https://www.apple.com/legal/privacy/en-ww/ (last accessed Sept. 25, 2023).

3. Data concerning consumers' habits, customs, and patterns are currency today, and because analytics and similar data is particularly rich and personal, it is particularly valuable currency. Apple derives substantial benefits from this data. The ramifications of unauthorized access to the highly personal details of this data can be severe, and individuals accordingly go to great lengths to safeguard their information. As technology develops at an exponentially faster pace which makes it impossible to predict the ramifications of personal data collection in the near future, consumers are

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

becoming more vigilant and go to great lengths to safeguard their information. Apple's promise of privacy thus resonates with consumers today more than ever.

4.    In contradiction of Apple's privacy promises, Apple tracks and collects large swaths of personal information from mobile device users while they use Apple Apps, regardless of device users' opting out of settings that otherwise permit the data sharing, including details about app usage, app browsing communications, personal information, and information relating to the mobile device itself.

5.    Apple has failed, and continues to fail, to respect and abide by the very privacy choices that it ostensibly extended to its users. Despite consumers expressly declining to give Apple permission to track and collect their data, Apple does just that by creating a detailed record of users' device use and habits and using that data for its own pecuniary gain.

6.    Apple's practices disregard their consumers' privacy preferences and expectations. These practices infringe upon consumers' privacy; intentionally deceive consumers; give Apple and its employees power to learn intimate details about individuals' lives, interests, and app usage; and make Apple a potential target for "one-stop shopping" by any government, private, or criminal actor who wants to undermine individuals' privacy, security, or freedom. Through its pervasive and unlawful data tracking and collection business, Apple knows even the most intimate and potentially embarrassing aspects of the user's app usage—regardless of whether the user accepts Apple's illusory offer to keep such activities private.

7.    Plaintiffs bring this action individually and on behalf of a class of similarly situated individuals, alternatively on behalf of various subclasses, alleging Apple's conduct: (1) breaches express contracts; (2) breaches implied contracts; (3) breaches the implied covenant of good faith and fair dealing; (4) amounts to an invasion of privacy; (5) violates California's Invasion of Privacy Act; (6) violates California's Unfair Competition Law; (7) violates California Penal Code section 638.51; (8) violates Pennsylvania's Wiretapping and Electronic Surveillance Act; (9) violates New York Gen. Bus. Law § 349; (10) violates New York Gen. Bus. Law § 350; (11) violates New Jersey's Consumer Fraud Act; (12) violates Illinois's Consumer Fraud and Deceptive Business Practices Act; and (13) and unjustly enriches Apple.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

8.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed classes, and at least one Class Member and Subclass Member is a citizen of a state different from Defendant.

9.    The Northern District of California has personal jurisdiction over Defendant named in this action because Apple's headquarters are located within this District and Apple conducts substantial business in this District through its headquarters, offices, and/or affiliates.

10.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District.

**PARTIES**

11.    Plaintiff Bruce Puleo is a resident of Boonton, New Jersey, and a citizen of New Jersey. Plaintiff Puleo currently owns three iPhones and an iPad. Prior to purchasing his devices, Plaintiff Puleo was exposed to advertisements from Apple touting the company's commitment to privacy. Plaintiff Puleo purchased his devices based in part on these representations. Plaintiff Puleo has turned off "Share [Device] Analytics" on his privacy controls. Plaintiff Puleo regularly uses Apps owned by Apple, including the App Store, Apple Music, Apple TV, and Stocks. For example, Plaintiff Puleo searched the App Store for Instagram, Prime Video, Zillow, and The RealReal ("the world's largest marketplace for authenticated luxury resale"). On Apple Music, Plaintiff Puleo searched for various artists. On Apple TV, Plaintiff Puleo searched for various movies and TV shows, including Mandalorian. On Stocks, Plaintiff Puleo has searched for a variety of stock symbols. Further, Plaintiff Puleo has opened Apps through non-Apple website such as Twitter (X), Instagram, and Google. Plaintiff Puleo used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Puleo's data while he was using Apple's Apps. Plaintiff Puleo never consented to Apple tracking his confidential communications while "Share [Device] Analytics" was turned off.

12.    Plaintiff Carlina Green was a resident of San Jose, California, and a citizen of California. Plaintiff Green currently owns an iPhone 12 and MacBook computer. Plaintiff Green has turned off "Share [Device] Analytics" on her privacy controls. Plaintiff Green regularly uses Apps owned by Apple, including the App Store and Books. For example, Plaintiff Green has searched for the following terms in the App Store: IHG+Bonvoy; roommate; target; BART; apartment; HBO; Muni; Firefox; LSAT; flights; dual messenger WhatsApp; screen time; Chromecast; used cars; San Francisco; WhatsApp stickers; dual space WhatsApp; TikTok; Snapchat; Disney; Prime Video; Zoom; Peacock; Instagram; Gmail; Spotify; Netflix; Amazon; Twitter; Google; Xfinity; justwatch; letterboxd; WhatsApp. Further, Plaintiff Green has opened Apps through non-Apple websites including "SENSORY: Life on the Spectrum" in Apple Books through a third party website; "TouchBanking" in the App Store through her credit union's website; "Paired: Couples & Relationship" in the App Store through a third party app; "Telehealth by SimplePractice" in the App Store from an email from a healthcare provider; "LiveWell with Advocate Aurora" in the App Store from an email; "COOP ATM Shared Branch Locator" in the App Store through her credit union's website; "Sutter Health My Health" in the App Store from an email from her healthcare provider; "athenaPatient" in the App Store from an email from her healthcare provider; and "SimplePractice Client Portal" in the App Store from an email from her healthcare provider. Plaintiff Green used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Green's data while she was using Apple's Apps. Plaintiff Green never consented to Apple tracking her confidential communications while "Share [Device] Analytics" was turned off.

13.    Plaintiff David Sgro is a resident of Quakertown, Pennsylvania, and a citizen of Pennsylvania. Plaintiff Sgro currently owns an iPhone SE. Prior to purchasing his device, Plaintiff Sgro was exposed to advertisements from Apple touting the company's commitment to privacy. Plaintiff Sgro purchased his device based in part on these representations. After purchase, Plaintiff Sgro reviewed the written disclosures that came with the device. Plaintiff Sgro has turned off "Share [Device] Analytics" on his privacy controls. Plaintiff Sgro regularly uses Apps owned by Apple, including the App Store, Safari, Camera, and Photos. For example, Plaintiff Sgro has searched for the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

following in the App Store: Zoom; Brave Browser; Instagram; and pdf scanner. Further, Plaintiff Sgro has opened Apps through third-party websites such as Telegram in the App Store through its website. Plaintiff Sgro used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Sgro's data while he was using Apple's Apps. Plaintiff Sgro never consented to Apple tracking his confidential communications while "Share [Device] Analytics" was turned off.

14.     Plaintiff A.H. is a minor who resides in San Jose, California, and is a citizen of California. Plaintiff A.H. currently owns and/or regularly uses an iPad. Plaintiff A.H. has turned off "Share [Device] Analytics." Plaintiff A.H. regularly uses Apps owned by Apple, including the App Store. For example, Plaintiff A.H. has searched the App Store for Roblox; YouTube; and games directed to children such as food-based games and hair salon games. Plaintiff A.H. used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff A.H.'s data while they were using Apple's Apps. Plaintiff A.H. never consented to Apple tracking their confidential communications while "Share [Device] Analytics" was turned off. At the time Plaintiff A.H.'s complaint was first filed, Plaintiff A.H. was 9 years old.

15.     Plaintiff Dottie Nikolich is a resident of Christopher, Illinois, and a citizen of Illinois. Plaintiff Nikolich currently owns an iPhone 14 Pro Max, and prior to that, she owned an iPhone 13 Pro Max.  Plaintiff Nikolich has turned off "Share [Device] Analytics" on her privacy controls. Plaintiff Nikolich regularly uses Apps owned by Apple, including the App Store and Apple Music. Plaintiff Nikolich used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Nikolich's data while she was using Apple's Apps. Plaintiff Nikolich never consented to Apple tracking her confidential communications while "Share [Device] Analytics" was turned off.

16.     Plaintiff Elena Nacarino is a resident of San Francisco, California, and a citizen of California. Plaintiff Nacarino currently owns an iPhone 11, iPhone SE, iPhone 6, and a MacBook Pro. Prior to purchasing her devices, Plaintiff Nacarino was exposed to advertisements from Apple touting the company's commitment to privacy. Plaintiff Nacarino purchased her devices based in part on these representations. Plaintiff Nacarino has turned off "Share [Device] Analytics" on her privacy

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

controls. Plaintiff Nacarino regularly uses Apps owned by Apple, including the App Store, Health, Notes, Clock, Mail, Weather, Photos, Wallet, and TV. Plaintiff Nacarino used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Nacarino's data while she was using Apple's Apps. Plaintiff Nacarino never consented to Apple tracking her confidential communications while "Share [Device] Analytics" was turned off.

17.    Plaintiff Francis Barrott is a resident of Chicago, Illinois, and a citizen of Illinois. Plaintiff Barrott currently owns an iPhone 13, iPad Air, MacBook Pro, and an Apple Watch. After purchase, Plaintiff Barrott reviewed the written disclosures that came with the devices. Plaintiff Barrott has turned off "Share [Device] Analytics" on his privacy controls. Plaintiff Barrott regularly uses Apps owned by Apple, including the App Store, Apple Music, Apple TV, Books, and Stocks. For example, Plaintiff Barrott searched the App Store for games, AI tools for professional writing, crypto market trackers, video converters, and password finders. He searched Apple Music for various artists and/or concerts including Bob Seger Live at Cobo Hall. As another example, Plaintiff Barrott searched Apple TV for various shows or movies including Ted Lasso. He also searched Stocks for specific ticker symbols including SRJX, VOOG, and VOO. Plaintiff Barrott used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Barrott's data while he was using Apple's Apps. Plaintiff Barrott never consented to Apple tracking his confidential communications while "Share [Device] Analytics" was turned off.

18.    Plaintiff Katie Alvarez is a resident of Brentwood, New York, and a citizen of New York. Plaintiff Alvarez currently owns an iPad, iPhone, MacBook, and Apple Watch. Prior to purchasing her devices, Plaintiff Alvarez was exposed to advertisements from Apple touting the company's commitment to privacy. Plaintiff Alvarez purchased her devices based in part on these representations. After purchase, Plaintiff Alvarez reviewed the written disclosures that came with the devices. Plaintiff Alvarez has turned off "Share [Device] Analytics" on her privacy controls. Plaintiff Alvarez regularly uses Apps owned by Apple, including the App Store and Apple TV. Plaintiff Alvarez used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Alvarez's data while she was using Apple's

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Apps. Plaintiff Alvarez never consented to Apple tracking her confidential communications while "Share [Device] Analytics" was turned off.

19.    Plaintiff E.M. is a minor who resides in Albany, California, and is a citizen of California. Plaintiff E.M. currently owns and/or regularly uses an iPhone 14 Pro. "Share [Device] Analytics" was turned off on Plaintiff E.M.'s device. Plaintiff E.M. regularly uses Apps owned by Apple. Plaintiff E.M. used these Apps while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff E.M.'s data while they were using Apple's Apps. Plaintiff E.M. never consented to Apple tracking their confidential communications while "Share [Device] Analytics" was turned off. At the time Plaintiff E.M.'s complaint was first filed, Plaintiff E.M. was 9 years old.

20.    Plaintiff Quincy Venter is a resident of South Gate, California, and a citizen of California. Plaintiff Venter currently owns an iPhone 13 Pro Max. Prior to purchasing his device, Plaintiff Venter was exposed to advertisements from Apple touting the company's commitment to privacy. Plaintiff Venter purchased his device based in part on these representations. After purchase, Plaintiff Venter reviewed the written disclosures that came with the device. Plaintiff Venter has turned off "Share [Device] Analytics" on his privacy controls. Plaintiff Venter regularly uses Apps owned by Apple, including the App Store, Notes, Clock, Calendar, and Calculator. For example, Plaintiff Ventwr has opened Apps through non-Apple websites including Ticketmaster and Capcut. Plaintiff Venter used these mobile applications while "Share [Device] Analytics" was turned off. Despite disabling that functionality, Apple accessed and recorded Plaintiff Venter's data while he was using Apple's Apps. Plaintiff Venter never consented to Apple tracking his confidential communications while "Share [Device] Analytics" was turned off.

## FACTUAL ALLEGATIONS

21.    Apple is the world's largest technology company with sales of $378.7 billion in 2022 and a market capitalization of $2.6 trillion. Jonathan Ponciano, *The World's Largest Tech Companies in 2022: Apple Still Dominates As Brutal Market Selloff Wipes Trillions In Market Value,* FORBES (May 12, 2022), https://www.forbes.com/sites/jonathanponciano/2022/05/12/the-worlds-largest-technology-companies-in-2022-apple-still-dominates-as-brutal-market-selloff-wipes-trillions-in-

market-value/. Defendant manufactures and produces some of the most popular mobile devices in the world, including the iPhone, iPad, and Apple Watch.

22.    The iPhone, Apple's version of a smartphone, is one of the two largest platforms in the world, alongside Android. As of 2022, the iPhone leads the smartphone market worldwide with a market share of 28.43 percent. *Smartphone Market Share Worldwide*, OBERLO, https://www.oberlo.com/statistics/smartphone-market-share.

23.    There are more than 1.4 billion iPhone users in the world. Rohit Shewale, *32 iPhone User Statistics,* DEMANDSAGE (Sept. 25, 2023), https://www.demandsage.com/iphone-user-statistics/.

24.    The iPhone is Apple's most valuable product and iPhone sales are responsible for 50 percent of Apple's revenue. It is credited with helping to make Apple one of the world's most valuable companies.

25.    The iPad is Apple's line of tablet computer devices. As of September 2020, Apple has sold more than 500 million iPads and the iPad is one of the most popular tablet computer devices. Michael Potuck, *Latest data suggest iPad sales hit highest growth rate in 6 years during Q2,* 9TO5MAC (Aug. 5, 2020), https://9to5mac.com/2020/08/05/latest-data-suggests-ipad-sales-hithighest-growth-rate-in-6-years-during-g2/.

26.    Both the iPhone and the iPad come preloaded with Apple's Apps, including the App Store, Apple Music, Apple TV, Books, and Stocks.

### A.    Apple Aggressively Markets That It Protects Privacy

27.    Over the years, Apple has promoted itself as a champion of privacy. In a 2015 interview with National Public Radio, Apple's Chief Executive Officer, Tim Cook, emphasized Apple's purported commitment to consumer privacy: "We see that privacy is a fundamental human right that people have. We are going to do everything that we can to help maintain that trust." *Apple CEO Tim Cook: 'Privacy Is A Fundamental Human Right'*, NPR (Oct. 1, 2015), https://www.npr.org/sections/alltechconsidered/2015/10/01/445026470/apple-ceo-tim-cookprivacy-is-a-fundamental-human-right.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

28.     In 2019, Apple ran an ad campaign, purportedly reiterating the company's stance on user privacy protections. Mike Wuerthele, *'Privacy. That's iPhone' ad campaign launches, highlights Apple's stance on user protection*, APPLE INSIDER (Mar. 14, 2019), https://appleinsider.com/articles/19/03/14/privacythats-iphone-ad-campaign-launches-highlights-apples-stance-on-user-protection.

29.     As part of the campaign, Defendant emblazoned 40-foot billboards of the iPhone with the simple slogan "Privacy. That's iPhone[,]" and ran the ads across the world for months. Thomas Germain, *Apple Is Tracking You Even When its Own Privacy Settings Say It's Not, New Research Says*, GIZMODO (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-trackingeven-when-off-app-store-1849757558.

30.     Exemplars of the billboards are below:





FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

31.    Apple's Apps are advertised as implicitly not collecting user data:



32.    Apple continuously reiterates that "[p]rivacy is a fundamental human right. It's also one of our core values. Which is why we design our products and services to protect it." *Privacy*, APPLE, https://www.apple.com/privacy/ (last accessed Sept. 25, 2023); *see* Mehak Agarwal, *'You should be in control of your data', says Apple CEO Tim Cook on privacy*, BUSINESS TODAY (May 19, 2022), https://www.businesstoday.in/technology/news/story/you-should-be-in-control-of-your-data-says-apple-ceo-tim-cook-on-privacy-334194-2022-05-19.

33.    Apple's website says, "Privacy. That's Apple." *Privacy*, APPLE, https://www.apple.com/privacy/ (last accessed Sept. 25, 2023).

34.    In an online video discussing Apple's App Tracking Transparency, Apple states "Whatever you choose is up to you... App Tracking Transparency. A simple new feature that puts your data back in your control." Privacy | App Tracking Transparency | Apple, https://www.youtube.com/watch?v=Ihw_Al4RNno (last accessed Oct. 6, 2023).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

35.    Apple put up other billboards in places like Las Vegas that stated, "What happens on your iPhone, stays on your iPhone." Hamza Shaban, *Apple stars at giant tech confab CES — without actually being there*, WASH. POST (January 7, 2019) https://www.washingtonpost.com/technology/2019/01/07/apple-burns-google-giant-billboard-touting-privacy-ces.



36.    Another billboard in New York announced, "Your iPhone knows a lot about you. But we don't." https://www.alamy.com/a-billboard-on-the-side-of-a-building-in-midtown-manhattan-ontuesday-july-9-2019-informs-viewers-of-the-privacy-afforded-by-using-apple-devices-richard-blevine-image260045682.html (last accessed Sept. 25, 2023).

37.    More recently, Mr. Cook, distributed a video in 2022 that stated, "It's your data. iPhone helps keep it that way." Mehak Agarwal, *"You should be in control of your data," says Apple CEO Tim Cook on privacy*, BUS. TODAY (May 19, 2022), https://www.businesstoday.in/technology/news/story/you-should-be-in-control-of-your-data-says-apple-ceo-tim-cook-on-privacy-334194-2022-05-19. Mr. Cook further stated that Apple believes,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"[p]rivacy is a fundamental right and we build it into all products and services at Apple. You should be in control of your data--- not the highest bidder." *Id.*

38.    Apple's privacy campaign continues to date.

**B.    Apple Promised Plaintiffs and Class Members it Would Protect Their Privacy**

39.    Consistent with Apple's purported privacy commitments, Apple claims to offer its mobile device users the option to control what data app developers can collect by adjusting their device's privacy settings.

40.    Apple represents that the "Share [Device] Analytics" setting sends Apple "daily diagnostic and usage data"



41.    Apple defines "**Usage Data**" as "Data about your activity on and use of our offerings, such as app launches within our services, including browsing history; search history; product interaction; crash data, performance and other diagnostic data; and other usage data." *Apple Privacy Policy,* Apple, https://www.apple.com/legal/privacy/en-ww/ (last accessed Sept. 25, 2023) (original emphasis).

42.    Apple uses this definition of "usage data" consistently throughout its contract documents, disclosures, and settings. *See App privacy details on the App Store*, APPLE, https://developer.apple.com/appstore/app-privacy-details/ (last accessed Jan. 14, 2024) ("Usage Data[:] [1] Product Interaction [-] Such as app launches, taps, clicks, scrolling information, music listening data, video views, saved place in a game, video, or song, or other information about how the user interacts with the app[;] [2] Advertising Data [-] Such as information about the advertisements

the user has seen[;] [3] Other Usage Data [-] Any other data about user activity in the app"); *App Store & Privacy*, APPLE, https://www.apple.com/legal/privacy/data/en/ app-store/ (last accessed Jan. 14, 2024) ("app **usage data** stored on your device — such as the apps you frequently open, the time you spend using certain apps, and your app installs and uninstalls"); *Sensor & Usage Data & Privacy*, APPLE,  https://www.apple.com/legal/privacy/data/en/sensor-usage-data/  (last  accessed  Jan.  14, 2024) ("Usage Data is information about how you use and interact with your iOS and watchOS devices and software. For example, this may include information about keyboard usage, the number of messages you send, the number of calls you make and receive, the categories of apps you use, the categories of websites you visit, when certain sensor and usage events are recorded, and when you wear your Apple Watch.").

43.    Apple promised that by turning off the "Share [Device] Analytics" setting Plaintiffs and the Class could "disable" the sharing of their data with Apple "altogether." *Device Analytics & Privacy*, APPLE, https://www.apple.com/legal/privacy/data/en/device-analytics/ (last accessed Oct. 6, 2023).

44.    "iPhone Analytics may include details about hardware and operating system specifications, performance statistics, and data about how you use your devices and applications." *Id*.

45.    Apple's Privacy Policy promises that:
At Apple, we respect your ability to know, access, correct, transfer, restrict the processing of, and delete your personal data. We have provided these rights to our global customer base and if you choose to exercise these privacy rights, you have the right not to be treated in a discriminatory way nor to receive a lesser degree of service from Apple. Where you are requested to consent to the processing of your personal data by Apple, you have the right to withdraw your consent at any time.

**To exercise your privacy rights and choices including where a third-party service provider is acting on Apple's behalf, visit the Apple Data and Privacy page at privacy.apple.com**

*Apple Privacy Policy,* APPLE, https://www.apple.com/legal/privacy/en-ww/ (last accessed Sept. 25, 2023) (original emphasis).

46.    Apple further states that consumers "are not required to provide the personal data that we have requested. However, if you choose not to do so, in many cases we will not be able to provide you with our products or services or respond to requests you may have." *Id*.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

47.    Apple represents that that it will not collect mobile device user data when users turn off "Share [Device] Analytics" in their devices' privacy settings.

**C.    Defendant Deceptively Collects User Data**

48.    Unbeknownst to Plaintiffs and the Class, and despite Apple's purported commitment to its mobile device users' privacy, Apple secretly tracks and collects a wide range of user data, even when mobile device users have turned off "Share [Device] Analytics" in their mobile device's privacy settings. This conduct is an apparent and direct contradiction of Apple's privacy promises.

49.    A recent study from two app developers and security researchers at the software company Mysk found that mobile device users' privacy settings had no effect on Apple's data collection when using a number of Apple Apps—the App Store, Apple Music, Apple TV, Books, and Stocks—as Apple's tracking remained the same whether or not the privacy settings were turned on or off. Thomas Germain, *Apple Is Tracking You Even When its Own Privacy Settings Say It's Not, New Research Says*, Gizmodo (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-trackingeven-when-off-app-store-1849757558.

50.    For example, Mysk discovered that the App Store harvests information about every single thing mobile device users do in real time in the app, including what was tapped on, which Apps were searched for, what ads were displayed, how long an app was viewed, and how the app was found. *Id.* Moreover, the App Store collected details about a user's mobile device as well, including device identification numbers, what kind of device was used, the device's screen resolution, the device's keyboard language, and how the user was connected to the internet. *Id.*

51.    "This data can be sensitive, especially when you consider that merely searching for Apps related to topics such as religion, LGBTQ issues, health and addiction can reveal details about a person's life." Thomas Germain, *Apple Sued for Allegedly Deceiving users With Privacy Settings After Gizmodo Story*, Gizmodo (Nov. 11, 2022), https://gizmodo.com/apple-iphone-privacy-analytics-class-action-suit-1849774313.

52.    Further, the Mysk study revealed that the Stocks app collected a mobile device user's list of watched stocks, the names of stocks viewed and searched for and time stamps when that occurred, as well as record of news articles a mobile device user saw in the Stocks app.

53.     Most concerning, however, is that the Mysk study discovered that in addition to tracking and collecting wide swaths of user data from device users who interact with Apple Apps, Apple collects a "Directory Services Identifier" that is tied to a mobile device user's iCloud account, and links their name, email address, and more to the harvested user data. Mitchel Clark, *iOS developers say Apple's App Store analytics aren't anonymous*, THE VERGE (Nov. 21, 2022), https://www.theverge.com/2022/11/21/23471827/apple-app-store-data-collection-analytics-personal-info-privacy.

54.     Regardless of whether users have revoked consent for Apple to collect their usage data, Apple collects consumers' usage data through its Apps.

55.     For each user who uses Apple Music, Apple collects and tracks usage data points including, but not limited to:

     a.  Age bucket - the age range of the user

     b.  Apple ID number - Apple account identifying number

     c.  Birth year - the user's birth year

     d.  Connection - type of internet connection

     e.  Device identifier - identifier for the user's device

     f.  Even end timestamp - the date and time at which the user's play even ended

     g.  Event start timestamp - the date and time at which the user's play event started

     h.  External Referral URL - the internet address of the web browser page from which the user was linked into the application

     i.  Gender - user's gender

     j.  IP city - the city from which the action occurred

     k.  IP country code - the country from which the action occurred

     l.  IP latitude - the latitude of the IP-derived city

     m. IP longitude - the longitude of the IP-derived city

     n.  IP network - the network from which the action occurred

     o.  IP network type - the type of network from which the action occurred

     p.  IP region code - the region from which the action occurred

q.  Offline - whether the event occurred offline or online

r.  Page history - the last five pages viewed by the user

s.  Referral app name - name of the referring application that caused the active application to launch

t.  Search term - the term used to generate the search results

u.  Store front - country from which the user action was taken

v.  Type - an event specific to opening or closing the application

w.  User action - actions the user took while interacting with a dialog

56.  For each user who uses the App Store, Apple collects and tracks usage data points including, but not limited to:

a.  Apple ID number

b.  Channel partner – the carrier code (e.g., ATT, EE)

c.  Click target – the target item on which the user clicked

d.  Event date time – date and time on which the activity occurred

e.  Event type – the user action taken on an app (e.g., click, search, enter, exit, etc.)

f.  External referral app name – application from which the user was referred to the current application or web page

g.  External referral URL – the internet address of the page that caused another store page to load

h.  Final search term – the final term used to generate search results

i.  Hardware model – the hardware model used

j.  Hardware type – the hardware family type

k.  IP city

l.  IP country code

m.  Language ID – the user-selected language for the App Store

n.  Operating system languages – language of the operating system used to complete the action

o.  Page history

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

p.  Referral app name

q.  Referring URL – the referring application or referring URL to App Store

r.  Search term – the term used to generate search results

s.  User actions

t.  User agent – information about the user's device from which the action occurred, including information about the operating system and browser

57.  For each user who uses Apple Books, Apple collects and tracks usage data points including, but not limited to:

a.  Apple ID number

b.  Capacity data - deresolutioned representation of the total disk space allocated to the data partition of the disk on the user's device

c.  Capacity data available – deresolutioned representation of the available free space on the data partition of the disk on the user's device

d.  Capacity disk – deresolutioned representation of the total disk space on the user's device

e.  Capacity system – deresolutioned representation of the total disk space allocated to the system partition of the disk on the user's device

f.  Capacity system available – deresolutioned representation of the available free space on the system partition of the disk on the user's device

g.  Click target – identifier for the item for which the user searched

h.  Click target type – type of button clicked

i.  Client ID – Apple account identifying number

j.  Event date time

k.  Event timestamp – the date and time of an event

l.  Event type

m.  External Referral URL

n.  Hardware model

o.  IP bandwidth – estimated bandwidth of device network connection from which the user action was taken

p.  IP City

q.  IP Continent

r.  IP Country – the country from which the action occurred

s.  IP Latitude

t.  IP Longitude

u.  IP network

v.  Network connection – type of internet connection

w.  Origin type – the devices used for playback (e.g., iPhone, iPad, etc.)

x.  OS version – version of the operating system used to complete the action

y.  Page history – list of recent visited pages, in order

z.  Referral app name

aa. Search term

bb. Term – the search term

cc. User agent

dd. Visit end time – the end time of the visit

ee. Visit start date – the start date of the visit

ff.  Visit start time – the start time of the visit

58.    For each user who uses the Game Center, Apple collects and tracks usage data points including, but not limited to:

a.  Apple ID number

b.  Device identifier

c.  Event date

d.  Event type

e.  Hardware family – the hardware family that the content event originated from (e.g., iPhone, MacBook Pro, smartTV)

f.  IP city

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

g.   IP country

h.   Is child account – whether or not the profile is considered to be a child account (under 13 years old or applicable minimum age)

i.   Media type – type of media (e.g., audio, iPhone)

j.   Media version – the specific version of a user's device

k.   Network connection

l.   Operating system – the submitting OS version

m.   Store front

59.    For each user who uses Apple TV, Apple collects and tracks usage data points including, but not limited to:

a.   Action details – the specific item of which the user action was taken

b.   Action URL – the internet address associated with the link on which the user took action

c.   Analytics browser name – the browser used for the Apple TV app from which an action was completed

d.   Analytics hardware brand – the brand of the device used

e.   Analytics hardware category – the category of device from which the user action was taken (Mobile, Desktop, TV, or Other)

f.   Analytics operating system – operating system on the user's device used to complete the action

g.   Apple ID number

h.   Click target type

i.   Country code – the user's country code

j.   Delegate app name – the name of the app to which the control is passed (e.g., desktop TV app)

k.   Destination URL – the link used by the active application to link out to another application

l.   Device keyboard language – the keyboard language for the user's device

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

m.  Event date time

n.  Event type

o.  External referral URL

p.  IP network

q.  Network connection type – the type of network connection

r.  Operating system

s.  Page history

t.  Referral app name

u.  Search term

v.  User actions - A set of user actions (e.g., click target, result, reason of the result, and server response time)

w.  User agent

x.  Visit end time

y.  Visit start time

60.     Apple collects and tracks similar usage data points for each of its Apps.

61.     As such, Apple tracks and collects detailed information about mobile device users while they use Apple Apps; Apple collects this information in contradiction of its own privacy promises; and the tracked and collected user data is directly linked to a mobile device user. *Id.* Put differently, "[w]hat happens on your iPhone stays on your iPhone, unless you count the mountains of information your iPhone sends to Apple." Thomas Germain, *Apple Is Tracking You Even When its Own Privacy Settings Say It's Not, New Research Says*, GIZMODO (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-trackingeven-when-off-app-store-1849757558.

**D.    Plaintiffs' and Class Members' User Data Has Immense Economic Value**

62.     Plaintiffs and Class Members have a reasonable expectation of privacy in their user data. Despite this expectation, consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected. Lance

Whitney, *Data privacy is a growing concern for more consumers*, TECHREPUBLIC (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

63.    A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

64.    Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by businesses. *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

65.    Data privacy is a growing concern among Americans. "'Every day, the momentum is growing to pass lifesaving legislation to protect kids online,' said Senators Blackburn and Blumenthal." MARSHA BLACKBURN U.S. SENATOR FOR TENNESSEE, *Blackburn, Blumenthal Celebrate Committee Passage of Kids Online Safety Act* (July 27, 2023), https://www.blackburn.senate.gov/2023/7/blackburn-blumenthal-celebrate-committee-passage-of-kids-online-safety-act. "Tech companies profit off of our habits, our finances, who we love, where we live, and our most sensitive health data. Every time you browse the web or wear a smart watch, a tech company is tracking you. They use this data to manipulate us, to addict us, and to keep us on their platforms so we can be fed more ads. Or they sell the data to the highest bidder so that companies you've never heard of can build profiles of you." ENERGY & COMMERCE COMMITTEE DEMOCRATS, *Opening Statement of Subcommittee Ranking Member Schakowsky* (April 27, 2023), https://democrats-energycommerce.house.gov/committee-activity/hearings/hearing-on-addressing-america-s-data-privacy-shortfalls-how-a-national. "As tech giants continue to egregiously

exploit personal data and put profits over safety, consumers need oversight and accountability." RICHARD BLUMENTHAL U.S. SENATOR FOR CONNECTICUT, *Blumenthal to Serve as Chair of Judiciary Subcommittee on Privacy & Technology* (Feb. 16, 2023), https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-to-serve-as-chair-of-judiciary-subcommittee-on-privacy-and-technology. "Data brokers and Big Tech's days of operating in the dark should be over. People should trust their data is being protected." ENERGY & COMMERCE, *Chair Rodgers: "People Should Trust Their Data is Being Protected."* (Mar. 1, 2023), https://energycommerce.house.gov/posts/chair-rodgers-people-should-trust-their-data-is-being-protected. Apple's foregoing advertisements pretend to address these concerns.

66.    Apple obviously recognizes the value of User Data in generating revenue through advertisements; user data is a vast source of revenue for tech companies like Apple. As the *Economist* has analogized, a user's personal data is the "oil field of the digital era." *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

67.    Last year Apple announced that it would start running more ads in the App Store, placing ads in the "Today tab," the first page a mobile device user sees when they open the App Store. Thomas Germain, *Apple Is Sneaking More Ads Onto Your Phone*, GIZMODO (Oct. 24, 2022), https://gizmodo.com/apple-app-store-ads-today-tab-homepage-1849694826.

68.    Apple also reportedly has plans to add ads to Apple TV, indicating that Apple is in the process of developing new data-driven business ventures. Kyle Barr, *Apple's Thinking Hard About Ads for Apple TV+ Content*, GIZMODO (Oct. 12, 2022), https://gizmodo.com/apple-appletv-mlb-1849647294.

69.    In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin." Brad Brown, Kumar Kanagasabai, Prashant Pant, & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar.

15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

70.    The information that Apple collects has substantial economic value. This value is well understood in the e-commerce industry, and personal information is now viewed as a form of currency.

71.    Well before this lawsuit, there was a growing consensus that consumers' sensitive and valuable personal information would become the new frontier of financial exploitation.

72.    Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

73.    Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.
>
> Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.

Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

74.    The cash value of the personal user information unlawfully collected by Apple during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure. Tim Morey, *What's Your Personal Data Worth?*, Design Mind (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

your-personal-data-worth.html. Contact information of the sort that Apple requires was valued by the study participants at approximately $4.20 per year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories (similar to the user data at issue here) were valued at a much higher rate: $52.00 per year. The chart below summarizes the findings:

75.    Similarly, the value of user-correlated internet browsing history (again, similar to the user data at issue here) can be quantified, because technology companies have been willing to pay



users for the same or substantially the same user data at issue here. For example, another technology company engaged in the data-collecting business Google had a panel called "Google Screenwise Trends" which is designed "to learn more about how everyday people use the Internet."

76.    Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. Those panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

77.    After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated conclusively that internet industry participants understood the enormous value in tracking internet users' browsing

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

habits. Google eventually paid Screenwise panelists up to $3 *per week* to collect the same or substantially the same user data at issue here.

78.    User-correlated browsing histories (again, similar to the user data at issue here) have monetary value. They also have non-monetary, privacy value. For example, in a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

79.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits."

80.    Congress has expressed serious concern for data collection practices similar to Apple's by other large tech companies that have blatantly disregarded consumer privacy preferences with respect to data sharing. In March 2019, Congress pressed Google on strikingly similar invasive practices:

> Q: Let's just – let's just get that on the record. Google collects geolocation history and information even if location history is turned off. Do you think that an average consumer, let's say a teenager with an Android phone would be surprised to learn that Google is tracking his location even when location services are turned off – turned off by scanning Wi-Fi networks around them throughout the day? Do you think he'd be surprised by that?

Testimony of Will Devries, Google Senior Privacy Counsel, United States Senate Judiciary Committee, *GDPR & California Consumer Privacy Act: Opt-Ins, Consumer Control, and the Impact on Competition and Innovation* (March 12, 2019), at 14.

81.    Consumers' sensitive and valuable personal information increased as a commodity, where technology companies began paying users specifically for their browsing data. Jack Marshall, *Google Pays Users for Browsing Data*, DIGIDAY (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

82.     As the thirst grew for sensitive, personal information, it became readily apparent that the world's most valuable resource was no longer oil, but instead consumers' data in the form of their sensitive, personal information. *See Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Paper No. 220 at 7 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en; *Supporting Investment in Knowledge Capital, Growth and Innovation*, OECD, at 319 (Oct. 13, 2013), https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman and Nicolas Glady, What's the Value of Your Data? TechCrunch (Oct. 13, 2015) https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/; Paul Lewis and Paul Hilder, *Former Cambridge Analytica exec says she wants lies to stop*, The Guardian (March 23, 2018) https://www.theguardian.com/uk-news/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies; Shoshanna Zuboff, The Age of Surveillance Capitalism 166 (2019); *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

83.     During the Class Period, a number of platforms have appeared where consumers can and do directly monetize their own data, and prevent technology companies from targeting them absent their express consent:

    a.     Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[1]

    b.     Loginhood similarly stated that it "let[] individuals earn rewards for their data and provide[d] website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocked ads and tracking on browsers as a plugin.[2]

---

[1] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disabled by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[2] https://loginhood.io/. See also, https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" sought to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[3]

d. Killi, founded in 2018, is a data exchange platform that allows users to own and earn from their data.[4]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[5]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended its reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on a computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks that user's activity, enters them into sweepstakes with monetary benefits, and users earn points worth up to $50 per month.[6]

84. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[7]

85. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value." *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, NO. 220

---

[3] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").
[4] https://killi.io/earn/.
[5] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").
[6] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/Apps-for-selling-your-data/.
[7] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounuciations-app.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

(Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf. In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses." *Id.*, at 25.

86.    The OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e. $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55." *Id.*

87.    Furthermore, tech companies have valued personal data in real-world dollars. For instance, Meta Platforms, f/k/a Facebook, has offered to pay individuals for their voice recordings. Jay Peters, *Facebook will now pay you for your voice recordings*, THE VERGE (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnciations-app.

88.    As another example, Facebook has paid teenagers and adults up to $20 per month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones. Saheli Roy Choudhury & Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html.

89.    Numerous other companies and applications such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data. *26 Apps That Pay You For Data Collection: Earn a Passive Income*, DOLLAR BREAK (Dec. 2, 2022), https://www.dollarbreak.com/Apps-that-pay-you-for-data-collection/.

90.    Given the monetary value that companies have already paid for personal information in the past, Defendant has deprived Plaintiffs and Class Members of the economic value of their user data without providing proper consideration for their property.

## CLASS ALLEGATIONS

91.    Plaintiffs bring this action, pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a class similarly situated individuals, defined as:

All natural persons who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "Class").

92.    Plaintiffs A.H. and E.M. ("Child Plaintiffs") additionally seek to represent a subclass defined as:

All natural persons under 18 years of age who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "Minor Subclass").

93.    Plaintiffs Venter, Nacarino, A.H., and Green (the "CA Plaintiffs") additionally seek to represent a subclass defined as:

All natural persons residing in California who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "CA Subclass").

94.    Plaintiff Sgro (the "PA Plaintiff") additionally seeks to represent a subclass defined as:

All natural persons residing in Pennsylvania who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with "Share [Device] Analytics" setting turned off (the, "PA Subclass").

95.    Plaintiff Alvarez (the "NY Plaintiff") additionally seeks to represent a subclass defined as:

All natural persons residing in New York who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "NY Subclass").

96.    Plaintiff Puleo (the "NJ Plaintiff") additionally seeks to represent a subclass defined as:

All natural persons residing in New Jersey who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile

Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "NJ Subclass").

97.     Plaintiffs Nikolich and Barrott (the "IL Plaintiffs") additionally seek to represent a subclass defined as:

All natural persons residing in Illinois who had details about hardware and operating system specifications, performance statistics, and data about how they used their devices and applications tracked and/or collected by Apple while using an Apple app (e.g., App Store, Apple Music, Apple TV, Books, and Stocks) on their mobile Apple device (i.e., iPhone, iPad, or Apple Watch) with the "Share [Device] Analytics" setting turned off (the, "IL Subclass").

98.     The Minor Subclass, CA Subclass, PA Subclass, NY Subclass, NJ Subclass, and IL Subclass are collectively referred to as the Subclasses.

99.     Excluded from the Class and Subclasses are Apple, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class and/or Subclasses, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

100.     **Numerosity:** The Class Members and members of the Subclasses are so numerous that individual joinder of all Class and Subclass Members is impracticable. The precise number of Class and Subclass Members, and their identities, may be obtained from the books and records of Apple, but is believed to be hundreds of thousands or millions of people.

101.     **Commonality:** This action involves questions of law and fact that are common to the Class and Subclass Members. Such common questions include, but are not limited to:

    a.    whether Apple intentionally intercepts the user data of its mobile device users;

    b.    whether Defendant acquires the contents of mobile device users' user data without their consent;

    c.    whether Defendant's conduct violates state privacy and anti-wiretapping laws;

    d.    whether Apple breached its contract by collecting user data;

    e.    whether Apple falsely advertised that it protected Plaintiffs', Class Members', and/or Subclass Members' privacy;

    f.    whether Plaintiffs, Class Members, and/or Subclass Members are entitled to equitable relief; and

g.  whether Plaintiffs, Class Members, and/or Subclass Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

102.  **Typicality:** Plaintiffs' claims are typical of the other Class Members' and/or Subclass Members' claims because, among other things, all Class and/or Subclass Members were comparably injured through the uniform prohibited conduct.

## TOLLING

103.  The statutes of limitations applicable to Plaintiffs' and Class members', including Subclasses', claims were tolled by Defendant's conduct and the resulting delayed discovery of their claims.

104.  As alleged above, Plaintiffs, Class Members, and Subclass Members did not know and could not have known with due diligence that Apple was tracking their (or their children's) user data when they interacted with Apple's proprietary Apps on their mobile devices because they had adjusted their mobile devices' privacy settings to turn off "Share [Device] Analytics" and Apple represented that it would not track their user data. Plaintiffs, Class Members, and Subclass Members could not have discovered, with due diligence, the full scope of Defendant's conduct – especially where Apple promised it was not collecting or tracking their user data.

105.  The earliest Plaintiffs, Class Members, and Subclass Members, acting with due diligence, could have reasonably discovered Apple's conduct would have been on or about November 8, 2022, following the public release of Mysk's investigation in various news articles.

## CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiffs and the Class)

106.  Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

107.  Plaintiffs bring this claim individually and on behalf of the Class.

108.  Generally, the elements for a breach of contract claim are as follows: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and

(4) damages to plaintiff as a result of the breach." *Putian Authentic Enter. Mgmt. Co., Ltd v. Meta Platforms, Inc.*, No. 5:22-CV-01901-EJD, 2022 WL 1171034, at *6 (N.D. Cal. Apr. 19, 2022).

109.    Apple's contract with Plaintiffs and the Class incorporates the mobile device's settings into the terms of the parties' agreement:

> In addition to this Privacy Policy, we provide data and privacy information embedded in our products and certain features that ask to use your personal data. This product-specific information is accompanied by our Data & Privacy Icon.
>
> You will be given an opportunity to review this product-specific information before using these features. You also can view this information at any time, either in Settings related to those features and/or online at apple.com/legal/privacy/data.

*Apple Privacy Policy,* APPLE, https://www.apple.com/legal/privacy/en-ww/ (last accessed Sept. 25, 2023); *see also iOS and iPadOS Software License Agreement,* APPLE, https://www.apple.com/legal/sla/docs/iOS16_iPadOS16.pdf (last accessed Sept. 26, 2023) ("Apple's collection and use of personal information is governed by the Apple Privacy Policy, available at https://www.apple.com/legal/privacy/.").

110.    Certain of Apple's settings promised that they would prevent Plaintiffs' and the Class's user data from being collected while they used an Apple device; specifically, the " "Share [Device] Analytics" setting.

111.    Apple describes the "Share [Device] Analytics" setting as follows: "Help Apple improve its products and services by automatically sending daily diagnostic and usage data. Data may include location information."



FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

112. The Device Analytics & Privacy agreement further states that, "[b]y using these features, you agree and consent to Apple's and its subsidiaries' and agents' transmission, collection, maintenance, processing, and use of this information as described above." *Device Analytics & Privacy*, APPLE, https://www.apple.com/legal/privacy/data/en/device-analytics/ (last accessed Sept. 21, 2023).

113. Plaintiffs and the Class turned off the "Share [Device] Analytics" settings. Plaintiffs and the Class fully performed their obligations under the agreement.

114. Despite promising Plaintiffs and the Class that their user data would not be collected if the "Share [Device] Analytics" settings was turned off, Apple breached the contract by continuing to collect user data whenever Plaintiffs and the Class interacted with Apple's Apps, such as the App Store, Apple Music, Apple TV, Books, and Stocks, as revealed by the Mysk investigation and detailed above.

115. As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to the premium they paid for Apple mobile devices (*e.g.*, iPhones, iPads, and Apple Watches) not to have their data collected, the value of their data, nominal damages, and other damages to be determined at trial.

## COUNT II
## BREACH OF EXPRESS CONTRACT
### (On Behalf of the Child Plaintiffs and the Minor Subclass)

116. Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

117. Child Plaintiffs bring this claim individually and on behalf of the Minor Subclass.

118. Apple promised the Child Plaintiffs and Minor Subclass that Apple would "not knowingly collect, use, or disclose any personal information from your child without your verifiable parental consent unless a COPPA exception applies." *Family Privacy Disclosure for Children*, APPLE, https://www.apple.com/legal/privacy/en-ww/parent-disclosure/ (last accessed Sept. 21, 2023) ("*Family Disclosure*").

119. The term "child" is undefined in the agreement and Apple does not put an age limit on this promise. *Id.* The term "child" is commonly defined as "a person not yet of the age of majority."

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

*Child*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/child (last accessed Sept. 21, 2023).

120.    Apple discloses that it will collect certain information from the Minor Subclass and *may* collect other information:

> As part of the process of creating an Apple ID for your child, ***we will ask*** you to provide information required to create an account that may include your child's full name, date of birth, a password, answers to three security questions, a phone number, and a country of residence. Your child's date of birth will be used to determine eligible services and suggest parental controls.

> ***We may collect other information from your child*** that in some cases has been defined under COPPA as personal information. For example, when your child is signed in with their Apple ID, we may collect things like device identifiers, cookies, IP addresses, and the geographic locations and time zones in which their Apple device is used. We may also collect information about your child's activities and interactions on our websites, Apps, products, and services, including content provided by third-party developers.

*Family Disclosure* (emphasis added).

121.    Child Plaintiffs and the Minor Subclass are third party beneficiaries to the contract formed by the Family Disclosure as Apple expressly or impliedly intended to provide Child Plaintiffs and the Minor Subclass with the benefit of protecting their data unless otherwise granted verifiable parental consent to collect the children's data.

122.    Child Plaintiffs and the Minor Subclass had turned off the "Share [Device] Analytics" setting. Child Plaintiffs and the Minor Subclass fully performed their obligations under the agreement.

123.    Reasonable consumers, like Child Plaintiffs and the Minor Subclass have no way of knowing that turning off the foregoing settings does not protect their data given Apple's other promises about the settings and privacy.

124.    Despite not receiving verifiable parental consent, as demonstrated by the Child Plaintiffs' and the Minor Subclass' device settings, Apple breached the contract by continuing to collect user data whenever Plaintiffs and the Class interacted with Apple's Apps, such as the App Store, Apple Music, Apple TV, Books, and Stocks, as revealed by the Mysk investigation and detailed above.

125.    Furthermore, Apple breached its agreement with Child Plaintiffs and the Minor Subclass by collecting data through its proprietary Apps (*e.g.*, App Store, Apple Music, Apple TV,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Books, and Stocks), as detailed above and made public by Mysk's investigation, without first obtaining verifiable parental consent, and while Child Plaintiffs and the Minor Subclass had turned off the "Share [Device] Analytics" setting, by seeking consent to data collection from the minor before the child uses ones of Apple's Apps for the first time.

126.    As a direct and proximate result of Defendant's breach of contract, Child Plaintiffs and the Minor Subclass have suffered and will continue to suffer injury, including but not limited to the premium they paid for Apple mobile devices (*e.g.*, iPhones, iPads, and Apple Watches) not to have their data collected, the value of their data, nominal damages, and other damages to be determined at trial.

**<u>COUNT III</u>**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class or, Alternatively, On Behalf of the Child Plaintiffs and the Minor Subclass)**

127.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

128.    Plaintiffs bring this claim individually and on behalf of the Class in the alternative to Count I. Additionally, Child Plaintiffs bring this claim individually and on behalf of the Minor Subclass in the alternative to Count I-II.

129.    "Like an express contract claim, the elements of an implied-in-fact contract claim are [1] a valid implied-in-fact contract, [2] the plaintiff's performance or excuse for nonperformance, [3] the defendant's breach of the agreement, and [4] the resulting damages to plaintiff." *Soil Retention Prod., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 952 (S.D. Cal. 2021) quoting *Iconlab Inc. v. Valeant Pharm. Int'l, Inc.*, No. 816CV01321JLSKES, 2017 WL 7240856, at *6 (C.D. Cal. Apr. 25, 2017) (applying California law).

130.    The nature of the agreement, as detailed in the foregoing paragraphs, between Plaintiffs, Class Members, and Apple was established through Apple's marketing materials, its disclosures, website, and privacy setting options. The totality of Apple's statements in these documents, to the extent that they are not ultimately deemed part of the express contract, creates an

implied contract that Apple would not collect and store user data when Plaintiffs and the Class had privacy settings engaged.

131.    As part of the "Device Analytics & Privacy" agreement, and by providing Plaintiffs and the Class with the ability to turn off the "Share [Device] Analytics settings, Apple impliedly promised that it would not track consumers who chose not to share their data by using ulterior means to gather the same data.

132.    Using ulterior means, such as data mining through Apple's own Apps, to gather the same data that Apple explicitly promises not to collect is a breach of good faith and fair dealing.

133.    Plaintiffs and the Class fully performed their obligations under the agreement.

134.    Defendant breached its implied contracts with Plaintiffs and Class Members by continuing to collect consumers' data who specifically asked not to have their data collected. These circumstances are such that it would be inequitable for Defendant to retain the benefits received.

135.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to the premium they paid for Apple mobile devices not to have their data collected, the value of their data, nominal damages, and other damages to be determined at trial.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(On Behalf of Plaintiffs and the Class or, Alternatively, On Behalf of the Child Plaintiffs, and the Minor Subclass)**

136.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

137.    Plaintiffs bring this claim individually and on behalf of the Class. In the alternative, Child Plaintiffs bring this claim individually and on behalf of the Minor Subclass.

138.    Good faith is an element of every contract. Wether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition

to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

139.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

140.    Plaintiffs and the Class fully performed their obligations under the agreement.

141.    Under the express or implied contract between Apple and its consumers, Apple reserved discretion to collect consumers' data:

> When you create an Apple ID, apply for commercial credit, purchase and/or activate a product or device, download a software update, register for a class at an Apple Store, connect to our services, contact us (including by social media), participate in an online survey, or otherwise interact with Apple, ***we may collect*** a variety of information[.]

*Apple Privacy Policy,* APPLE, https://www.apple.com/legal/privacy/en-ww/ (last accessed Sept. 25, 2023) (emphasis added). Other disclosures also indicate that Apple reserved discretion when it came to collecting a consumer's data while using Apple's mobile devices: "***We may collect other information from your child.***" *Family Disclosure* (emphasis added).

142.    Apple breached the implied covenant of good faith and fair dealing by applying its contractually reserved discretion in a manner that deprives Plaintiffs and the Class of the privacy benefits intended by the implied or express contract between the parties.

143.    Defendant breached its express or implied contracts with Plaintiffs and Class Members by continuing to collect consumers' data who specifically asked not to have their data collected. These circumstances are such that it would be inequitable for Defendant to retain the benefits received.

144.    As a direct and proximate result of Defendant's breach of the implied covenant, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to the premium they paid for Apple mobile devices not to have their data collected, the value of their data, nominal damages, and other damages to be determined at trial.

<u>**COUNT V**</u>
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class or, Alternatively,**

**On Behalf of the CA Plaintiffs and CA Subclass)**

145.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

146.    Plaintiffs bring this claim individually and on behalf of the Class. Alternatively, the CA Plaintiffs, who are residents of California, bring this claim individually and on behalf of the CA Subclass, who are residents of California.

147.    California's Constitution contains a right to privacy that creates a right of action against private entities such as Defendant. The principal purpose behind California's constitutional right to privacy was to protect against unnecessary information gathering, use, and dissemination by entities such as Defendant.

148.    As described herein, Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Class, including at least the following:

a.    The privacy interests created by California's Invasion of Privacy Act;

b.    The California Constitution, which guarantees its citizens the right to privacy;

c.    The Fourth Amendment right to privacy concerning personal computing devices, including web-browsing histories, as recognized by the United States Supreme Court; and

d.    Apple's Privacy Policy and related policies referenced therein, and other public promises Defendant made regarding its commitment to protecting users' privacy generally and its promises not to track/record users' communications while the "Share [Device] Analytics" setting was turned off.

149.    Plaintiffs and the Class had a reasonable expectation of privacy under the circumstances in that: (a) Defendant affirmatively promised its users it would not track their communications or access their computing devices while they were using an app while "Share [Device] Analytics" was turned off; and (b) they could not have reasonably expected that Defendant would commit acts in violation of state civil and criminal laws.

150.    Defendant's actions constitute a serious invasion of privacy in that they: (a) invaded a zone of privacy protected by the Fourth Amendment (*i.e.*, the right to privacy in data contained on personal computing devices, including user data, browsing histories, and app activity); (b) violated

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

state privacy laws concerning wiretapping and invasion of privacy, including California's Invasion of Privacy Act; (c) constituted the unauthorized taking of valuable personal information, through deceit, of millions of Americans without their consent; and (d) invaded the privacy rights of millions of Americans without their consent, including minors.

151.    Committing criminal acts against millions of Americans, including minors, constitutes an egregious breach of social norms that is highly offensive to a reasonable person. These acts are particularly egregious and offensive insofar as Defendant's surreptitious and unauthorized tracking of internet communications involves the personally identifiable information of individuals who took active measures—recommended by Defendant itself—to ensure their privacy.

152.    Defendant lacked a legitimate business interest in tracking and/or collecting its users' data while using an app, without their consent, while "Share [Device] Analytics" was turned off.

153.    Defendant's conduct has needlessly harmed Plaintiffs and the Class by capturing a large swath of personally identifying information, including intimate personal facts and data in the form of their user data. This disclosure and loss of privacy and confidentiality has caused Plaintiffs and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

154.    Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiffs and the Class of the economic value of their interactions with Defendant's Apps, without providing proper consideration.

155.    Plaintiffs and the Class have thus been damaged by Defendant's invasion of their privacy and are entitled to, and seek, just compensation and injunctive relief, including disgorgement of profits Apple earned off of mining Plaintiffs' and the Class's data.

156.    Plaintiffs and the Class have suffered an injury in fact, resulting in the loss of money and/or property, as a proximate result of the wrongful conduct and violations of law alleged herein.

157.    Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiffs and the Class without their consent anytime they interact with an Apple App on their mobile device. Therefore, Plaintiffs and the Class are entitled to, and seek declaratory and/or injunctive relief to prevent future interceptions of their communications by Defendant.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## COUNT VI
### VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT
#### Cal. Penal Code § 632
#### (On Behalf of Plaintiffs and the Class or, Alternatively,
#### On Behalf of the CA Plaintiffs and CA Subclass)

158.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

159.    Plaintiffs bring this claim individually and on behalf of the Class. Alternatively, the CA Plaintiffs, who are residents of California, bring this claim individually and on behalf of the CA Subclass, who are residents of California.

160.    The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

161.    Cal. Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars[.]

Accordingly, a defendant must show it had the consent of all parties to a communication.

162.    Apple maintains its principal place of business in California; designed, contrived and effectuated its scheme to track and record consumer communications while they were browsing Apps from their device while "Share [Device] Analytics" was turned off, in California; and has adopted California substantive law to govern its relationship with its users.

163.    At all relevant times, Apple's tracking and recording of Plaintiffs' and the Class's communications was without authorization and consent when Plaintiffs used an app while "Share [Device] Analytics" was turned off.

164.    Apple's Apps constitute an "amplifying or recording device" under CIPA.

165.    Plaintiffs and the Class have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personally identifiable information.

166.    Pursuant to California Penal Code § 637.2 and Plaintiffs' and the Class's injury by Apple's violations of California Penal Code § 632, Plaintiffs and the Class seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT VII**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Civ. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs and the Class or, Alternatively, On Behalf of the Child Plaintiff, the Minor Subclass, CA Plaintiffs, and CA Subclass)**

167.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

168.    Plaintiffs bring this claim individually and on behalf of the Class. Alternatively, the CA Plaintiffs bring this claim individually and on behalf of the CA Subclass and the Child Plaintiff brings this claim individually and on behalf of the Minor Subclass.

169.    The CA Plaintiffs and CA Subclass Members are individuals who reside in California.

170.    Apple is a "person" as that term is defined by, *inter alia*, Cal. Bus. & Prof. Code § 17201.

171.    Defendant violated the California Unfair Competition Law ("UCL"), §§ 17200, *et seq*., by engaging in unlawful, unfair, and deceptive business acts and practices in relation to its practice of unlawfully collecting and using data from its iPhone, iPad, and Apple Watch users, even if they indicated they do not want to be tracked on their mobile devices.

172.    Defendant's unlawful, unfair, and deceptive acts and practices includes, as detailed above, but is not limited to:

    a.    Illegally recording consumers' confidential activity on its Apps;

    b.    Unlawfully collecting, storing, sharing, or otherwise using data from its mobile device users while representing to users that the data collection software was inactivated on their devices;

c.    Not honoring the requests of its users to refrain from tracking users' data while using Apple devices;

d.    Continuing to lead users to believe that Apple is not receiving the data or tracking app usage, while Apple continues to do so without the users' knowledge or consent;

e.    Defendant misrepresented that it would protect the privacy and data analytics of Plaintiffs and the Class who elected not to share that information with Apple yet failed to do so. Apple employed a systematic, uniformly-themed disclosure and marketing campaign in which Defendant represented to customers that their data was safe when they used Apple mobile devices with privacy settings engaged. Defendant further omitted, suppressed, and/or concealed the material fact that it would continue to track users' communications and data usage even after those users requested that Apple not track or record Plaintiffs' communications or access their computing devices and Apps; and

f.    Defendant engaged in unlawful business practices by violating Cal. Penal Code § 632, California's Constitution, the Children's Online Privacy Protection Act, 18 U.S.C. § 2510, *et seq.*, and 18 Pa. Cons. Stat. § 5701, *et. seq.*

173.    Defendant's illegal collection of user data also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition as contemplated under the UCL. Because Plaintiffs and the Class Members did not and could not know of Apple's continued tracking of their data analytics and impermissible use of their personal data, they could not have reasonably avoided the harm caused by Defendant's practices.

174.    Defendant's misrepresentations to Plaintiffs and the Class were material because they were likely to deceive reasonable individuals about Defendant's adherence to its own privacy policies and procedures for turning off the "Share [Device] Analytics" feature.

175.    Defendant intended to mislead Plaintiffs and the Class as well as induce them to rely on Apple's misrepresentations.

176.    If Apple had disclosed to Plaintiffs and the Class that it would continue to receive their user data regardless of the election to turn tracking and/or collection features off, Defendant would have been unable to continue its business while disregarding users' privacy and data security.

However, Defendant instead received, maintained, and compiled Plaintiffs' and the Class's personal data without advising class members that Apple would continue to invade their privacy and track data usage without their knowledge. Accordingly, Plaintiffs and the Class acted reasonably in relying on Defendant's misrepresentations about de-activating the data tracking features on their Apple devices that Apple would continue to receive this data despite users' requests to the contrary.

177.    Defendant acted intentionally, knowingly, and maliciously to violate the UCL in reckless disregard of Plaintiffs' and the Class's rights.

178.    Without such misrepresentations, Plaintiffs and Class Members would not have purchased their devices from Defendant or would have paid less for them.

179.    As a direct and proximate result of Defendant's violations of the UCL, Plaintiffs and the Class sustained actual losses and damages as described herein.

180.    Plaintiffs and the Class seek restitution, injunctive relief, and other and further relief as the Court may deem just and proper. To the extent any of these remedies are equitable, Plaintiffs seek them in the alternative to any adequate remedy at law they may have.

181.    Additionally, Plaintiffs and the Class seek damages for the price premium paid to Defendant for their Apple mobile devices.

## COUNT VIII
### USE OF A PEN REGISTER OR TRAP AND TRACE DEVICE
### Cal. Penal Code § 638.51
### (On Behalf of Plaintiffs and the Class or, Alternatively,
### On Behalf of the CA Plaintiffs and CA Subclass)

182.    Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

183.    Plaintiffs bring this claim individually and on behalf of the Class. Alternatively, the CA Plaintiffs, who are residents of California, bring this claim individually and on behalf of the CA Subclass, who are residents of California.

184.    California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

185.    California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

186.    Apple's mobile applications constitute a "pen register" because they are devices or processes that record addressing or signaling information—Plaintiff and Class Members' data and personally identifiable information—from the electronic communications transmitted by their devices.

187.    Specifically, Apple secretly records app usage information, including nearly every single thing mobile device users do in real time in the App, including what was tapped on, which apps were searched for, what ads were displayed, how long an app was viewed, and how the app was found.

188.    Moreover, Apple secretly collected details about a user's mobile device as outlined *supra*, ¶¶ 48-61, including device identification numbers, what kind of device was used, the device's screen resolution, the device's keyboard language, and how the user was connected to the internet. These details included location information.

189.    Apple was not authorized by any court order to use a pen register to track Plaintiffs' and the Class's data and personally identifiable information.

190.    At all relevant times, Apple's tracking and recording of Plaintiffs' and the Class's communications, data, and personally identifiable information was without authorization and consent when Plaintiffs and the Class used an app while "Share [Device] Analytics" was turned off.

191.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek injunctive relief and statutory damages in the amount of $5,000 per violation.

<u>**COUNT IX**</u>
**VIOLATION OF PENNSYLVANIA'S WIRETAPPING AND ELECTRONIC
SURVEILLANCE ACT
18 Pa. Cons. Stat. § 5701, *et. seq*
(On Behalf of the PA Plaintiffs and PA Subclass)**

192.    The PA Plaintiffs and PA Subclass incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

193.    The PA Plaintiffs bring this claim individually and on behalf of the PA Subclass.

194.    The PA Plaintiffs and PA Subclass Members are individuals who reside in Pennsylvania and whose user information was illegally taken by Defendant as described *supra*.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

195.    The Pennsylvania Wiretapping and Electronic Surveillance Act ("WESCA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

196.    Any person who intercepts, discloses or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the WESCA is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

197.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

198.    "Contents" when "used with respect to any wire, electronic or oral communication," is defined as "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

199.    "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

200.    "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

201.    Apple is a person for the purposes of the WESCA because it is a corporation.

202.    Apple's mobile devices (e.g., iPhones, iPads, and Apple Watches) are a "device" used for the acquisition of the contents of any wire, electronic, or oral communication within the meaning of the WESCA.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

203.    The PA Plaintiffs' and PA Subclass Members' intercepted personal information and consumer data constitute the "contents" of "electronic communication[s]" within the meaning of the WESCA. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 132 (3d Cir. 2022).

204.    Defendant intentionally intercepts and procures the PA Plaintiffs' and PA Subclass Members' personal information without consent, even when the "Share [Device] Analytics" setting is turned off.

205.    The PA Plaintiffs' and PA Subclass Members' electronic communications are intercepted contemporaneously with their transmission.

206.    The PA Plaintiffs and PA Subclass Members did not consent to having their personal information wiretapped.

207.    As the Third Circuit recently stated in *Popa v. Harriet Carter Gifts*, WESCA "reduces [the term intercept] to acquiring certain communications using a device. And based on just that definition, anyone could 'intercept' communications, including people who 'acquire' a text message or chat sent directly to them." 52 F.4th at 126. The Third Circuit held, "Consistent with [WESCA's] emphasis [on the protection of privacy], it applies when anyone intercepts communications—that is, takes an action to acquire them with a device. And it requires all parties—not just a party—to consent to that interception." *Id.*, at 133. The court further made clear that "there is no sweeping direct-party exception to civil liability under the WESCA." *Id.*, at n.5.

208.    This holding was confirmed when the court denied the petition for rehearing *en banc*, on October 18, 2022. To avoid running afoul of the WESCA, the Third Circuit identified a simple solution: obtain consent. Here, Defendant did not obtain consent before intercepting the communications of the PA Plaintiffs and the PA Subclass Members.

209.    Pursuant to 18 Pa. Cons. Stat. 5725(a), the PA Plaintiffs and PA Subclass Members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

210.    Apple's conduct is ongoing, and it continues to unlawfully intercept the communications of the PA Plaintiffs and PA Subclass Members without their consent anytime they

interact with an Apple app on their mobile device. The PA Plaintiffs and PA Subclass Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT X
### VIOLATION OF NEW YORK'S GEN. BUS. LAW § 349
#### (On Behalf of the NY Plaintiffs and NY Subclass)

211.    The NY Plaintiffs and NY Subclass incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

212.    The NY Plaintiffs bring this claim individually and on behalf of the NY Subclass.

213.    The NY Plaintiffs and NY Subclass Members are individuals who reside in New York and whose user information was illegally taken by Defendant as described *supra*.

214.    The NY Plaintiffs and NY Subclass Members are "persons" within the meaning of N.Y. Gen. Bus. Law ("GBL") § 349(h).

215.    GBL § 349(a) states that, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

216.    Defendant engaged in deceptive acts and practices in the form of material misrepresentations to consumers during the conduct of business with the NY Plaintiffs and NY Subclass Members in violation of GBL § 349(a).

217.    As fully alleged herein, Defendant engaged in unfair and deceptive acts and practices in violation of GBL § 349(a); specifically, by stating that its devices would maintain user privacy when requested. *Privacy*, Apple, https://www.apple.com/privacy/ (last accessed Sept. 21, 2023).

218.    Apple advertises its privacy characteristics to New York consumers on billboards, the sides of buildings, at the point of sale on its website and in brick-and-mortar store locations, and through mass media, such as social media and internet ads.

219.    Apple states proactively that, "[e]very day, people go about their lives unaware that their personal information is being harvested." *Id.* Reasonable consumers would be misled by this statement to believe Apple did not harvest their personal information.

220.    Apple knowingly made such misrepresentation to mislead consumers, thereby enabling it to gather this valuable information uninterrupted.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

221.    Apple covered up its willful misrepresentations with, *inter alia*, options on its iPhone to make users believe their privacy was ensured, statements on their website stating "Privacy. That's Apple," and other affirmative acts to mislead consumers. *Id.*

222.    Apple's knowing misrepresentations caused the NY Plaintiffs and NY Subclass damages as previously described. These damages are separate and distinct from any losses as the result of Defendant's breach of contract and other state claims.

223.    Apple also made material misrepresentations regarding its use of user information for marketing and advertising purposes, and its continued harvesting and use of that information even in situations where the NY Plaintiffs and NY Subclass Members choose to opt out of tracking and data collection.

224.    Reasonable consumers would be misled by Defendant's material misrepresentations concerning their privacy.

225.    Had the NY Plaintiffs and the NY Subclass Members known of Defendant's intention to collect and monetize their private information, the NY Plaintiffs and NY Subclass Members would not have purchased Defendant's devices and/or used Apple's Apps.

226.    Had the NY Plaintiffs and NY Subclass Members known of Defendant's intention to collect and monetize their private information, the NY Plaintiffs and NY Subclass Members would not have purchased Defendant's devices at the premium price to other equivalent phones.

227.    As a direct and proximate result of Defendant's violations, the NY Plaintiffs and NY Subclass Members suffered injury, as comports with GBL § 349(h).

228.    The NY Plaintiffs, on behalf of themselves and the NY Subclass Members, under GBL § 349(h), seek the greater of actual damages or statutory damages for their private information that Defendant improperly collected and monetized.

229.    Additionally, the NY Plaintiffs, on behalf of themselves and the NY Subclass Members, seek the greater of actual damages or statutory damages for the price premium paid to Defendant, under GBL § 349(h).

230.    Because Apple made knowing misrepresentations to consumers, NY Plaintiffs seek statutory treble damages for themselves and the NY Subclass under GBL § 349(h).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

231.    As a direct and proximate result of Defendant's material misrepresentations to consumers concerning their privacy, the NY Plaintiffs and the NY Subclass continue to suffer harm.

232.    The NY Plaintiffs and NY Subclass seek injunctive relief in the form of an order (1) compelling Defendant to cease and desist in harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of user information have been collected, who had access to that information, and how Defendant used the information.

233.    The NY Plaintiffs and NY Subclass seek to recover their actual damages or $50 (whichever is greater), three times actual damages, and reasonable attorneys' fees.

### COUNT XI
### VIOLATION OF NEW YORK'S GEN. BUS. LAW § 350
### (On Behalf of the NY Plaintiffs and NY Subclass)

234.    The NY Plaintiffs and the NY Subclass incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

235.    The NY Plaintiffs bring this claim individually and on behalf of the NY Subclass.

236.    The NY Plaintiffs and the NY Subclass Members are individuals who reside in the State of New York and whose user information was illegally taken by Defendant as described, *supra*.

237.    The NY Plaintiffs and the NY Subclass Members are "persons" within the meaning of GBL § 349(h).

238.    GBL § 350 states that, "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

239.    False statements of material facts are covered under this statute, as evidenced by GBL § 350(a) stating:

> representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

240.    Apple advertises to New York consumers on billboards, the sides of buildings, at the point of sale on its website and in brick-and-mortar store locations, and through mass media, such as social media and internet ads.

241.    As stated specifically within this Complaint, Apple has billboards stating, "What happens on your iPhone stays on your iPhone."

242.    Further, Apple's website (the point of sale of much of its consumer products) states, "Privacy. That's Apple."

243.    Apple's CEO Tim Cook has specifically stated on NPR radio that:

[Apple] do[es] think that people want us to help them keep their lives private. We see that privacy is a fundamental human right that people have. We are going to do everything that we can to help maintain that trust. […] Our view on this comes from a values point of view, not from a commercial interest point of view. Our values are that we do think that people have a right to privacy. And that our customers are not our products. We don't collect a lot of your data and understand every detail about your life. That's just not the business that we are in.

244.    This is contrary to what researchers have found to be true.[8]

245.    Apple's knowing misrepresentations caused the NY Plaintiffs and the NY Subclass damages as described within this Complaint.

246.    The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of contract and other state claims.

247.    Reasonable consumers would be misled by Defendant's material misrepresentations in Apple's advertising concerning their privacy.

248.    Had the NY Plaintiffs and the NY Subclass Members known of Defendant's intention to collect and monetize their private information, the NY Plaintiffs and NY Subclass Members would not have purchased Defendant's devices and/or used Apple's Apps.

249.    Had the NY Plaintiffs and NY Subclass Members known of Defendant's intention to collect and monetize their private information, the NY Plaintiffs and NY Subclass Members would not have purchased Defendant's devices at the premium price to other equivalent phones.

250.    As a direct and proximate result of Defendant's violations, the NY Plaintiffs and NY Subclass Members suffered injury, as comports with GBL § 350.

---

[8] Thomas Germain. *Apple Is Tracking You Even When Its Own Privacy Settings Say It's Not, New Research Says*, GIZMODO (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-tracking-even-when-off-app-store-1849757558.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

251.    The NY Plaintiffs, on behalf of themselves and the NY Subclass Members, seek the greater of actual damages or statutory damages for their private information that Defendant improperly collected and monetized.

252.    Additionally, the NY Plaintiffs, on behalf of themselves and the NY Subclass Members, seek the greater of actual damages or statutory damages for the price premium paid to Defendant.

253.    Because Apple made knowing misrepresentations to consumers, NY Plaintiffs seek statutory treble damages for themselves and the NY Subclass.

254.    As a direct and proximate result of Defendant's material misrepresentations to consumers concerning their privacy, the NY Plaintiffs and NY Subclass Members continue to suffer harm.

255.    The NY Plaintiffs, on behalf of themselves and the NY Subclass, seek injunctive relief in the form of an order (1) compelling Defendant to cease and desist in the improper harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of user information have been collected, who had access to that information, and how Defendant used the information.

256.    The NY Plaintiffs and NY Subclass seek to recover their actual damages or $500 per violation (whichever is greater), three times actual damages, and reasonable attorneys' fees.

**COUNT XII**
**VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-1, *et seq.***
**(On Behalf of the NJ Plaintiffs and NJ Subclass)**

257.    The NJ Plaintiffs and the NJ Subclass incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

258.    The NJ Plaintiffs bring this claim individually and on behalf of the NJ Subclass.

259.    The NJ Plaintiffs and the NJ Subclass Members are individuals who reside in the State of New Jersey and whose user information was illegally taken by Defendant as described, *supra*.

260.    New Jersey's Consumer Fraud Act ("CFA") provides that:
The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8-2.

261.    The CFA is a broad, consumer protection statue with expansive remedies for violations.

Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

N.J. Stat. Ann. § 56:8-19.

262.    "Thus, to state a claim under the CFA, a plaintiff must allege three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Belmont Condo. Ass'n, Inc. v. Geibel*, 432 N.J. Super. 52, 74, 74 A.3d 10, 23 (App. Div. 2013)

263.    Defendant's unfair and deceptive acts and practices includes, as detailed above, but are not limited to:

      a.    Illegally recording consumers' confidential activity on its consumer mobile applications;

      b.    Unlawfully collecting, storing, sharing, or otherwise using data from its mobile device users while representing to users that the data collection software was inactivated on their devices;

      c.    Not honoring the requests of its users to refrain from tracking users' data while using Apple devices;

      d.    Continuing to lead users to believe that Apple is not receiving the data or tracking app usage, while Apple continues to do so without the users' knowledge or consent; and

      e.    Defendant misrepresented that it would protect the privacy and data analytics of Plaintiffs and the Class who elected not to share that information with Apple yet failed to do so.

Apple employed a systematic, uniformly-themed disclosure and marketing campaign in which Defendant represented to customers that their data was safe when they used Apple mobile devices with privacy settings engaged. Defendant further omitted, suppressed, and/or concealed the material fact that it would continue to track users' communications and data usage even after those users requested that Apple not track or record Plaintiffs' communications or access their computing devices and Apps.

264.    Reasonable consumers would be misled by Defendant's material misrepresentations concerning their privacy.

265.    Had the NJ Plaintiffs and the NJ Subclass Members known of Defendant's intention to collect and monetize their private information, the NJ Plaintiffs and NJ Subclass Members would not have purchased Defendant's devices and/or used Apple's Apps.

266.    Had the NJ Plaintiffs and NJ Subclass Members known of Defendant's intention to collect and monetize their private information, the NJ Plaintiffs and NJ Subclass Members would not have purchased Defendant's devices at the premium price to other equivalent phones.

267.    As a direct and proximate result of Defendant's violations, the NJ Plaintiffs and NJ Subclass Members suffered injury, as comports with the CFA.

268.    The NJ Plaintiffs, on behalf of themselves and the NJ Subclass Members, seek actual and treble damages for their private information that Defendant improperly collected and monetized.

269.    Additionally, the NJ Plaintiffs, on behalf of themselves and the NJ Subclass Members, seek actual and treble damages for the price premium paid to Defendant.

270.    As a direct and proximate result of Defendant's material misrepresentations to consumers concerning their privacy, the NJ Plaintiffs and NJ Subclass Members continue to suffer harm.

271.    The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of contract and other state claims.

272.    The NJ Plaintiffs, on behalf of themselves and the NJ Subclass, seek injunctive relief in the form of an order (1) compelling Defendant to cease and desist in the improper harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of

user information have been collected, who had access to that information, and how Defendant used the information.

273.    The NJ Plaintiffs and NJ Subclass seek to recover their actual damages, three times actual damages, any other appropriate legal or equitable relief determined by the Court, and reasonable attorneys' fees and costs.

## COUNT XIII
### VIOLATION OF ILLINOIS'S CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*
### (On Behalf of the IL Plaintiffs and IL Subclass)

274.    The IL Plaintiffs and the IL Subclass incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

275.    The IL Plaintiffs bring this claim individually and on behalf of the IL Subclass.

276.    The IL Plaintiffs and the IL Subclass Members are individuals who reside in the State of Illinois and whose user information was illegally taken by Defendant as described, *supra*.

277.    Illinois's Consumer Fraud and Deceptive Business Practices Act ("CFDA") provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, […] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. Ann. 505/2.

278.    "To state a claim under the [CFDA], Plaintiffs must allege five elements: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) the damages were proximately caused by the defendant's deception." *Blankenship v. Pushpin Holdings, LLC*, 157 F. Supp. 3d 788, 792 (N.D. Ill. 2016).

279.    Apple advertises to Illinois consumers on billboards, the sides of buildings, and at the point of sale on its website, as well as mass media and the internet.

280.    As stated herein, along with the other advertisements identified in the foregoing paragraphs, Apple has billboards stating, "What happens on your iPhone stays on your iPhone." Further, Apple's website (the point of sale of much of its consumer products) states, "Privacy. That's Apple."

281.    Further, despite representing to Plaintiffs and the Class that their user data would not be collected if the "Share [Device] Analytics" settings was turned off, Apple continued to collect user data whenever Plaintiffs and the Class interacted with Apple's Apps, such as the App Store, Apple Music, Apple TV, Books, and Stocks, as revealed by the Mysk investigation and detailed above and below.

282.    Apple's privacy representations are contrary to what researchers have found to be true. *See* Thomas Germain. *Apple Is Tracking You Even When Its Own Privacy Settings Say It's Not, New Research Says*, Gizmodo (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-tracking-even-when-off-app-store-1849757558.

283.    In addition to Apple's false advertisements, Defendant's unfair and deceptive acts and practices includes, as detailed above, but are not limited to:

            a.    Illegally recording consumers' confidential activity on its consumer mobile applications;

            b.    Unlawfully collecting, storing, sharing, or otherwise using data from its mobile device users while representing to users that the data collection software was inactivated on their devices;

            c.    Not honoring the requests of its users to refrain from tracking users' data while using Apple devices;

            d.    Continuing to lead users to believe that Apple is not receiving the data or tracking app usage, while Apple continues to do so without the users' knowledge or consent; and

            e.    Defendant misrepresented that it would protect the privacy and data analytics of Plaintiffs and the Class who elected not to share that information with Apple yet failed to do so. Apple employed a systematic, uniformly-themed disclosure and marketing campaign in which Defendant represented to customers that their data was safe when they used Apple mobile devices

with privacy settings engaged. Defendant further omitted, suppressed, and/or concealed the material fact that it would continue to track users' communications and data usage even after those users requested that Apple not track or record Plaintiffs' communications or access their computing devices and Apps.

284. Apple's knowing conduct caused the IL Plaintiffs and the IL Subclass damages as described within this Complaint.

285. Reasonable consumers would be misled by Defendant's material misrepresentations and/or omissions concerning their privacy.

286. Had the IL Plaintiffs and the IL Subclass Members known of Defendant's intention to collect and monetize their private information, the IL Plaintiffs and IL Subclass Members would not have purchased Defendant's devices and/or used Apple's Apps.

287. Had the IL Plaintiffs and IL Subclass Members known of Defendant's intention to collect and monetize their private information, the IL Plaintiffs and IL Subclass Members would not have purchased Defendant's devices at the premium price to other equivalent phones.

288. As a direct and proximate result of Defendant's violations, the IL Plaintiffs and IL Subclass Members suffered injury, as comports with the CFDA.

289. The IL Plaintiffs, on behalf of themselves and the IL Subclass Members, seek actual damages for their private information that Defendant improperly collected and monetized.

290. Additionally, the IL Plaintiffs, on behalf of themselves and the IL Subclass Members, seek actual damages for the price premium paid to Defendant.

291. As a result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, the IL Plaintiffs and IL Subclass Members continue to suffer harm.

292. The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of contract and other state claims.

293. The IL Plaintiffs, on behalf of themselves and the IL Subclass Members, seek actual damages for their private information that Defendant improperly collected and monetized.

294. Additionally, the IL Plaintiffs, on behalf of themselves and the IL Subclass Members, seek actual damages for the price premium paid to Defendant.

295. Further, the IL Plaintiffs, on behalf of themselves and the IL Subclass Members, seek punitive damages for Defendant's outrageous data harvesting and reckless indifference towards consumers' rights of privacy, including the advertised privacy rights which Defendant claims to bestow and protect.

296. As a direct and proximate result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, the IL Plaintiffs and IL Subclass Members continue to suffer harm.

297. The IL Plaintiffs, on behalf of themselves and the IL Subclass, seek injunctive relief in the form of an order (1) compelling Defendant to cease and desist in the improper harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of user information have been collected, who had access to that information, and how Defendant used the information.

298. The IL Plaintiffs and IL Subclass seek to recover their actual damages, punitive damages, any other appropriate legal or equitable relief determined by the Court, and reasonable attorneys' fees and costs.

299. The damages described in this Count are separate and distinct from any losses as the result of Defendant's breach of contract and other state claims.

**COUNT XIV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class or, Alternatively, On Behalf of the Child Plaintiffs, and the Minor Subclass)**

300. Plaintiffs and the Class incorporate by reference and re-allege each and every allegation set forth in paragraphs 1 through 105.

301. Plaintiffs bring this claim individually and on behalf of the Class in the alternative to Counts 1-IV. In the alternative, Child Plaintiffs bring this claim individually and on behalf of the Minor Subclass in the alternative to Counts I-IV.

302. Plaintiff and the proposed Class unwittingly conferred benefits on Defendant as a result of Defendant's intentional receipt of their personal and confidential information, despite

representing that Defendant would not collect such information if the "Share [Device] Analytics" setting was turned off.

303.    Defendant has been enriched when it obtained Plaintiff's and the proposed Class's personal and confidential information without consent for its own financial advantage (i.e., to develop, maintain, and improve Apple's services, measure Apple's performance, or otherwise to create operational efficiencies and be more competitive). As a result, Defendant enjoyed increased profits while Plaintiff and the proposed Class received nothing in return.

304.    Under these circumstances, equity and good conscience militate against permitting Defendant to retain the profits and benefits from its wrongful conduct. Such profits and benefits should accordingly be disgorged or placed in a constructive trust so that Plaintiff and the proposed Class can obtain restitution.

305.    Plaintiff and the proposed Class lack an adequate remedy at law to address the unfair conduct alleged herein. Legal remedies available to Plaintiff and the proposed Class are inadequate because they are not equally certain and prompt as equitable relief. Damages are not equally certain as restitution insofar as the Court may award restitution even if it determines that insufficient evidence is provided to support an award of damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves, the Class, and all Subclasses, pray for relief and judgment against Defendant as follows:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiffs and Plaintiffs' attorneys to represent the Class, including under Rules 23(b)(2) and 23(b)(3) or, alternatively, under Rule 23(c)(4);

B.    Declare that Apple's conduct violates the laws referenced herein;

C.    Award compensatory damages, including statutory damages and treble damages where available, and/or restitution to Plaintiffs and the Class against Apple in an amount to be proven at trial, including interest thereon;

D.    Award punitive damages, where available, to Plaintiffs and the Class against Apple in an amount to be determined at trial, including interest thereon;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

E.   Permanently restrain Apple, and its officers, agents, servants, employees and attorneys, from engaging in the misconduct alleged herein, including the correction of the misrepresentations, material omissions, breached disclosures and terms, and underlying conduct;

F.   Award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees, including through California Code of Civil Procedure § 1021.5; and

G.   Grant such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: April 17, 2025                    Respectfully submitted,

*/s/   L. Timothy Fisher*
L. Timothy Fisher (SBN 191626)
*ltfisher@bursor.com*
**BURSOR & FISHER, P.A.**
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700

Philip L. Fraietta*
*pfraietta@bursor.com*
Matthew A. Girardi*
*mgirardi@bursor.com*
Julian C. Diamond*
*jdiamond@bursor.com*
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

Dated: April 17, 2025                    */s/ (Eddie) Jae K. Kim*
**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
117 East Colorado Blvd., Suite 600
Pasadena, CA 91105
Telephone: (626) 550-1250
Facsimile: (619) 756-6991

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

**LYNCH CARPENTER, LLP**
Gary F. Lynch*
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
gary@lcllp.com

*admitted *pro hac vice*

*Interim Co-Lead Counsel*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT